**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JANE DOE,** | |
| **PLAINTIFF,** | **CIVIL ACTION NO.** |
| | **COMPLAINT** |
| **-- against --** | **JURY TRIAL DEMANDED** |
| **THE JUILLIARD SCHOOL,** | |
| **DEFENDANT.** | |

Plaintiff Jane Doe ("Plaintiff"),[1] by and through her attorneys, The Fierberg National Law Group, PLLC, brings this action against The Juilliard School ("Juilliard," or "the University") and hereby alleges as follows:

**I.    OVERVIEW**

1.    In December 2021, Plaintiff filed a formal complaint with Juilliard's Title IX Office for sexual misconduct and relationship violence against a fellow Juilliard student and her former boyfriend, John Roe ("Roe"). Juilliard's investigation, conducted by the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump" or "Investigators"), one of the largest law firms in the country, lasted seven months and included 12 witness interviews, in addition to multiple interviews of Plaintiff and Roe, and over 60 exhibits.

2.    The investigation yielded three recommended findings of responsibility against Roe for "commit[ing] acts of violence" against Jane, including findings that: 1) he gripped her throat and struck her across the face during a sexual encounter on November 9, 2021 (dating

---

[1] Plaintiff contemporaneously files a Motion to Proceed by the Pseudonym Jane Doe in this action.

violence); 2) sexually assaulted her during that same encounter (sexual assault); and 3) filmed her without consent during sexual activities (sexual exploitation).

3.    Despite clear evidence of abuse and Akin Gump's recommended findings against Roe, after Juilliard's procedurally flawed and discriminatory four-day Title IX hearing in October 2022 ("Hearing"), Roe was found "not responsible" of every count.

4.    Plaintiff's Juilliard-appointed advisor for the proceedings had assured Plaintiff that, based on his experience, the Hearing Panel would almost certainly uphold at least some, if not all, of Akin Gump's findings. What transpired during the Hearing shocked Plaintiff and her advisor.

5.    Plaintiff had observed a clear shift in the three-person hearing panel's treatment of her in the very first hours of the Hearing. The hearing panel consisted of three individuals: Jennifer McLaughlin and Dina Vespia of the law firm of Cullen and Dykman LLP and Juilliard faculty member Ronald Blake (together "Hearing Panel"). Ms. McLaughlin served as the Hearing Chair.

6.    While Juilliard's Title IX Officer at the time, Reisha Williams, was not on the Hearing Panel, upon information and belief, she supervised the entire Hearing, including the Zoom breakout room sessions. Ms. Williams also consulted with the Hearing Panel on the relevancy of certain questions.

7.    Once Plaintiff reviewed the video recordings of the Hearing when they became available to her *after* the Hearing's conclusion, it became clear why the tone had shifted. Two and a half hours into the first day of the Hearing, the Hearing Panel held an *ex parte* meeting with Roe's attorney advisor ("Roe's Attorney") in a breakout room over Zoom, which Ms. Williams created and supervised, without Plaintiff or her advisor present.

8.    During that patently improper *ex parte* meeting, Roe's Attorney made numerous false and inaccurate, discriminatory, prejudicial, and impermissible statements about Plaintiff's

relationship and sexual history, as well as her mental health treatment and mental health history, to attack her credibility.

9.    Such topics are barred under federal and State law, as well as Juilliard's policies, during sexual misconduct hearings.

10.    Privately to the Hearing Panel, Roe's Attorney made inaccurate and patently improper statements as to Plaintiff's purported mental health history, including that "**she had hospital issues before she met [Roe]**," even though Plaintiff had never been hospitalized, even for a broken bone; **"had a breakdown before"**; and **"tried to kill herself."**

11.    These statements were impermissible under the law and highly prejudicial. They were also untrue.

12.    In that same *ex parte* meeting, Roe's Attorney propounded damaging gender-based stereotypes to the Hearing Panel, claiming that Plaintiff was more prone to crying rape, allegedly because she was "**concern[ed] someone would rape her because she'd been raped before,**" which was untrue: Plaintiff had not been "raped" before and had not claimed to have been.

13.    Statements about a party's sexual relationships are and were, at all relevant times, prohibited during sexual misconduct hearings under federal and State law and Juilliard's own policies.

14.    This statement played to the most toxic gender-based stereotypes about women and female survivors of sexual assault: that they lie and "cry rape."

15.    Neither Plaintiff nor her advisor was present before the Hearing Panel to defend against these statements, which infected the Hearing from the outset with gender bias, including bias against victims of relationship violence, and perceived disability bias based on the inaccurate information that Roe's Attorney put forth about Plaintiff's mental health and sexual history.

16.     As a result of this private meeting with the Hearing Panel, Juilliard permitted Roe's Attorney to harass Plaintiff's witnesses with patently improper questions about Plaintiff's mental health and sexual relationships, thereby engaging in and perpetuating egregious gender and disability discrimination and willfully disregarding the fundamental tenets of a fair and impartial hearing, which are codified in 34 C.F.R. Part 106, the implementing regulations to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX") and N.Y. Educ. Law §§ 6439-6449 ("NYEL"), and which are appended to Juilliard's Sexual Misconduct Policy.

17.     These *ex parte* statements, as well as the ensuing impermissible and prejudicial cross examination, were so damaging to Plaintiff that the Hearing Panel found in favor of Roe on all counts, overturning the Akin Gump's multiple recommended findings of responsibility against him – findings that were the result of a seven-month-long comprehensive investigation.

18.     By permitting Roe's Attorney's to make impermissible and highly discriminatory gender and disability-based attacks on Plaintiff and on her witnesses, and by breaching all tenets of a fair and impartial hearing in allowing Roe's Attorney to do so, Juilliard discriminated against Plaintiff as a result of her female gender, her status as a victim of relationship violence, and her perceived mental health disability.

19.     Plaintiff suffered reputational injury and emotional distress as a result of participating in the Hearing, which was biased and egregiously violated her rights to a fair and impartial hearing, and resulted in a finding in favor of Roe. This finding not only discredited Plaintiff's report of gender-based violence against Roe but required her to continue her studies on campus with Roe – the individual whom she reported had violently abused her without a no-contact order ("NCO") in place for the remainder of the semester, until he graduated. Plaintiff feared every day for her physical safety and suffered from harm to her reputation.

20.    Plaintiff now brings claims under the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 296 *et seq.*; the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-502(a) *et seq.*; and New York common law. Plaintiff seeks damages for the injuries she suffered as a result of the discriminatory hearing that created a hostile education environment on the basis of her gender.

## II.    THE PARTIES

21.    Plaintiff is a 28-year-old graduate of Juilliard who received her Master of Fine Arts degree. Plaintiff is domiciled in Alabama.

22.    Defendant The Juilliard School is a private university located in Manhattan, New York City.

## III.    JURISDICTION AND VENUE

23.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

24.    Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f). Defendant Juilliard is headquartered in this District, and the unlawful educational practices complained of in this complaint occurred in this District, as well as the events or omissions that gave rise to Plaintiff's claims.

## IV.    FACTUAL ALLEGATIONS

### A. Plaintiff Reported to Juilliard that Roe Had Engaged in Gender-Based Violence against Her

25.    In or around December 2021, Juilliard's Title IX Office encouraged Plaintiff to rush to file a formal Title IX complaint against Roe so that they could put in place an NCO

before the holiday break. Juilliard's Title IX Office assured Plaintiff that they had an excellent

Title IX team and process in place and that they would take care of her during that process.

26.    Plaintiff was given a very short amount of time to write her complaint, but given

the Title IX Office's urging and its representations that a formal complaint would impose a

mutual NCO, on December 15, 2021, Plaintiff filed her complaint against Roe with the Title IX

Office to ensure her safety.

27.    The Title IX Office did not advise Plaintiff that she could obtain an NCO without

the filing of a formal complaint and that there was no rush to file a formal complaint. Had she

been provided that information, she would have requested only the NCO at that time before

proceeding with a complaint.

28.    The Title IX Office's instruction was in violation of 34 C.F.R. Part 106, which, at

all relevant times, required schools to offer complainants supportive measures, whether or not they

filed a formal complaint, including implementing mutual restrictions on contact between the

parties.

29.    Specifically, at all relevant times, under Title IX's implementing regulations, even

if no formal complaint were filed, the Title IX Office must: "take other appropriate prompt and

effective steps, in addition to steps necessary to effectuate the remedies provided to an individual

complainant, if any, to ensure that sex discrimination does not continue or recur within the

recipient's education program or activity." 34 CFR 106.44(f)(1)(vii). Mutual non-contact orders

were, at all relevant times, an appropriate supportive measure that a Title IX coordinator may take,

regardless of whether a formal complaint is filed. *See* 34 CFR 106.30.

30.     By having Plaintiff file a formal Title IX complaint against Roe to receive an NCO, Juilliard unnecessarily raised the stakes for Plaintiff and Roe and propelled Plaintiff into a lengthy and Title IX investigation, hearing, and appeals process.

**B. Plaintiff Reports Numerous Instances in Which Roe Violates the NCO, but Juilliard Fails to Take Corrective Action**

31.     In the months after Plaintiff filed her Title IX complaint, Plaintiff reported to the Title IX Office and Investigators over fifteen instances spanning January 2022 through November 2022, just after the Hearing determination, where Roe potentially violated the NCO between the parties, including by engaging in:

    a.  Stalking behavior, in which Roe: a) sat in the audience during one of her performances, mocking her; b) lingered outside her classroom or inside her classroom when it was time for Plaintiff to enter class; and c) walked into her classroom while she was sitting for a class headshot for Juilliard's website and glared at her instead of immediately exiting;

    b.  Intimidation tactics, in which Roe walked up next to or approached Plaintiff on at least two instances on campus and sang loudly at her to intimidate her;

    c.  Indirect breaches of the parties' NCO, in which Respondent's friends sat at Plaintiff's dressing room table, looked at her personal mirror photos on her desk, left Roe's cap right next to her desk, and pressured her to resolve the Title IX proceedings against Roe through an informal process.

32.     As a result of these breaches of the NCO, Plaintiff no longer felt physically safe on campus, including in her own dressing room. Plaintiff consequently moved out of her dressing room, which caused her to lose eating and dressing time, let alone opportunities to socialize and work with peers, faculty, and mentors on campus.

33.    Despite Plaintiff's reporting numerous instances of the potential NCO violations, the Title IX Office took no meaningful action to investigate or stop the misconduct, leading to a hostile education environment for Plaintiff, which isolated her from her peers and community, and deprived her of equal access to educational opportunities during the investigative and hearing process and thereafter.

### C.    Investigators Issue Draft and Final Reports with Recommended Findings of Responsibility against Roe

34.    In August 2022, following a seven-month investigation, including interviewing Plaintiff, Roe, and at least twelve other witnesses, as well as reviewing over sixty exhibits, the Investigators issued a Final Report, which made the recommended findings of responsibility against Roe for strangling Plaintiff and striking her face, sexually assaulting her, and recording Plaintiff without her consent during sex.

35.    When Plaintiff spoke with her advisor hired by Juilliard – who was not an attorney but someone who specializes in advising students in Title IX proceedings – about the recommended findings and the chances of success in the upcoming hearing, he assured her that the hearing would confirm some portion of the findings and that, in his experience with Juilliard, it was unprecedented that they would overturn all of them.

36.    As a result, Plaintiff did not seriously entertain retaining counsel for the hearing, nor did she consider engaging in a mediated informal resolution with Roe to resolve her formal complaint prior to the four-day Hearing.

### D.    Juilliard Was Required to Follow Stringent Policies and Applicable Laws Governing Sexual Misconduct Hearings

37.    Juilliard students must adhere to Juilliard's policies and the law. On its website, Juilliard explains that "[t]he rights and responsibilities of Juilliard students are set forth in The

Juilliard School Student Code of Conduct, a contract between the School and the student that supersedes all division handbooks and applies to all students enrolled at Juilliard until their graduation, including during School breaks and leaves of absence."

38.    On its website, Juilliard emphasizes the high bar set by the Student Code of Conduct: "When students choose to enroll in Juilliard, they accept the rights and responsibilities of membership in the School's academic and social community. As community members, Juilliard expects students to uphold its values by maintaining high standards of conduct."

39.    Under Juilliard's Student Code of Conduct, at all relevant times, "falsification, distortion, or misrepresentation of information within the conduct process" was considered a violation and an abuse of the student conduct system.

40.    Under Juilliard's Student Code of Conduct, at all relevant times, "attempting to influence the impartiality of a School official or a member of the hearing panel before and/or during the course of a conduct proceeding" was also a violation and an abuse of the student conduct system.

41.    Under Juilliard's Sexual Misconduct Policy, implemented on August 14, 2020, and in effect at all relevant times, sexual misconduct was and remains strictly prohibited.

42.    At all relevant times, the Sexual Misconduct Policy promised students a "prompt, thorough, fair, and impartial investigation."

43.    Similarly, as required under the NYEL, at all relevant times, Juilliard's Students' Bill of Rights was appended to Juilliard's Sexual Misconduct Policy ("Appendix B"), which affords all students the right to "participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

44.    These provisions to Juilliard's policy are fundamental to a fair, impartial hearing and are emphasized throughout Juilliard's policies.

45.    Plaintiff relied on these express promises, which Juilliard was required to make by law, in determining that she wished to proceed with a formal complaint and Sexual Misconduct Hearing and not pursue an informal resolution with Roe or even to withdraw her complaint altogether to avoid a prejudicial and damaging hearing that would tarnish her reputation among her peers and mentors who were crucial to her educational access and career success.

46.    Plaintiff relied on the fact that Juilliard would uphold the law and its policies in administering justice.

47.    Had Plaintiff pursued an informal resolution with Roe instead of a formal hearing, she would not have had to endure a seven-month long investigation, which included Roe's submission of numerous sexually explicit and intimate videos of Plaintiff that were viewed by Juilliard administrators and others, most of which were taken without her knowledge or consent. She would also not have had to endure a one-sided Hearing that besmirched her character before the Hearing Panel, which included a Juilliard faculty member, some of her closest friends, and her mother. The prejudice and gender bias that permeated the Hearing cleared Roe of any wrongdoing, and shamed Plaintiff, despite Investigative findings to the contrary.

48.    At all relevant times, Title IX and Juilliard's Sexual Misconduct Policy prohibited questions as to the complainant's prior relationships or sexual history as not relevant, unless to prove "that someone other than the respondent committed the conduct alleged by the complainant," or prior sexual experiences with the respondent to prove consent. 34 C.F.R. § 106.45(b)(6)(i)-(ii). These exceptions did not apply here.

49.    Under the NYEL, at all relevant times, "every student" had a right: "To exclude their own prior sexual history with persons other than the other party in the judicial or conduct process."

50.    At all relevant times, Title IX's implementing regulations prohibited questions that seek information about any party's medical, psychological, or similar records.

51.    At all relevant times, Juilliard's Sexual Misconduct Policy and Title IX's implementing regulations prohibited questions about a party's "mental health diagnosis or treatment" without prior written consent, which Plaintiff did not provide in these proceedings.

52.    The NYEL, at all relevant times, permitted Plaintiff to exclude her "own mental health diagnosis and/or treatment from admittance in the institution disciplinary stage that determines responsibility."

53.    While Plaintiff had the right to exclude her prior sexual relationships and mental health diagnosis or treatment under the applicable laws and Juilliard's policy, she was denied the ability to exercise that right when Juilliard permitted Roe's Attorney to make improper, discriminatory, inadmissible, and false or misleading statements during the *ex parte* meeting with the Hearing Panel.

54.    Furthermore, prior to the Hearing, on or about August 31, 2022, Juilliard held a pre-hearing conference with Plaintiff and her Juilliard-appointed advisor to review Juilliard's rules of conduct for the Hearing. Juilliard reviewed "rules of decorum" for the parties and their advisors, including the limited role of the advisor in the Hearing.

55.    Under Juilliard's policies, at all relevant times, the only purpose of the advisor was to deliver cross examination of the witnesses.

56.    Advisors were not permitted to speak on behalf of the parties or to otherwise disrupt the proceedings.

57.    During the conference, Juilliard discussed "the impact of providing false statements to the Hearing Panel."

58.    Furthermore, throughout the Hearing, Juilliard warned Plaintiff, Roe, and their advisors that violations of these rules of decorum could result in the placement of limitations on an individual's participation in the hearing, including: a) removal from the hearing; b) adjustments to the manner of participation; or c) postponement of the hearing.

59.    Juilliard never took any of these actions, but instead permitted and perpetuated Roe's Attorney's egregious violations of the rules of decorum and Juilliard's policies.

60.    Despite the applicable laws and policies, Juilliard conducted a fundamentally flawed and biased sexual misconduct hearing process that was biased against Plaintiff because of her gender, her status as domestic violence survivor, and her perceived disability.

### E.  The Hearing Panel Engages in Prejudicial *Ex Parte* Conversations with Roe's Attorney on the First Day of the Hearing

61.    The Hearing took place over Zoom and commenced on October 11, 2022 and continued on October 12, 13, and 24, 2022.

62.    Plaintiff, her advisor, Roe, and Roe's Attorney were all in attendance at the Hearing.

63.    At the start of the Hearing, Hearing Chair McLaughlin read through the rules governing all parties and their advisors, including an express warning that the parties' advisors were not permitted to speak on behalf of the parties and were not to disrupt the proceedings.

64.    Furthermore, Ms. McLaughlin instructed that all procedural questions were to be handled by Juilliard's Title IX Office.

65.    The parties made opening statements and both answered questions from the Hearing Panel.

66.    Once that portion of the Hearing concluded, around two hours into the Hearing, the first witness, Witness 1, was called for cross examination by both sides' advisors.

67.     Witness 1 had been a close friend of Plaintiff's and had provided powerful evidence in the Investigation against Roe.

68.     Witness 1 reported that she had observed the troubling "love-bombing" behavior early in the parties' relationship, where Roe frequently bought Plaintiff gifts. She also told Investigators that Plaintiff confided in her about Roe's outbursts of anger and that after the relationship, Plaintiff had spoken to her about the sexual violence in the relationship.

69.     Roe's Attorney aggressively questioned Witness 1 and was quick to get irritated and annoyed if she did not like Witness 1's answers. In one instance, Roe's Attorney was asking Witness 1 questions about a voice message she received from Plaintiff and her recollection of the message. Roe's Attorney did not request and Juilliard did not play this voice message to refresh Witness 1's recollection during the Hearing. As a result, Roe's Attorney's line of questioning quickly became confusing and frustrating. Finally, Witness 1 said: "It's so long ago, certain things I can't remember. But I surely know [Plaintiff] has changed from the time that we were together and really close friends until the time that she was hospitalized."

70.     While making this statement, Witness 1 grew emotional and began crying.

71.     Visibly unhappy with Witness 1's response and her corroboration of Plaintiff's allegations, Roe's Attorney then jumped at the opportunity to present improper, untrue, prejudicial, and irrelevant information in front of the witness and the Hearing Panel, arguing: "So you are aware she was hospitalized, she had hospital issues *before* she met Roe, isn't that correct?"

72.     This was false. Plaintiff was not hospitalized or otherwise institutionalized for mental health issues and had no "hospital issues" before she met Roe. This fact was also not contained anywhere in the evidentiary record.

73.    Witness 1 appeared confused and concerned by Roe's Attorney's representations, unsure how to answer the question.

74.    The Hearing Chair then ruled Roe's Attorney's question irrelevant.

75.    Clearly displeased with Witness 1's testimony and the Hearing Panel's ruling, Roe's Attorney grew irritated and suggested a breakout room session with the Hearing Panel.

76.    The Hearing Panel granted Roe's Attorney's request. Before doing so, Hearing Chair McLaughlin remarked that Roe's Attorney and Witness 1 appeared to be talking about "two different" hospitalizations, thereby repeating this falsity and seemingly accepting it as true *in the presence* of Witness 1, even though Plaintiff had never been previously hospitalized.

77.    Juilliard's Title IX Officer, Ms. Williams, then placed Roe's Attorney, Roe, and the Hearing Panel in a breakout room but did not invite or otherwise include Plaintiff or her advisor at any point. Ms. Williams recorded the session and supervised it.

78.    Then, without Plaintiff or her advisor present, the Title IX Office and the Hearing Panel betrayed any sense of fundamental fairness in a proceeding – and broke Juilliard's Policies with respect to the limited role of advisors during the Hearing – by allowing Roe's Attorney to influence the Hearing Panel with inaccurate, misogynistic, gender- and disability-biased, and false, inaccurate, or misleading information about Plaintiff, without providing Plaintiff an opportunity to learn of the evidence being presented against her and to respond to the same.

79.    Specifically, without Plaintiff or her advisor present, Roe's Attorney argued privately to the Hearing Panel:

> Everyone knows that [Plaintiff] is lying about that, that she had a breakdown before. And so for [Witness 1] to say [Plaintiff] changed **when everyone who knew her knew that she had issues with guys, issues with concern someone would rape her because she'd been raped before** . . . that's not going into her mental illness for the purpose of credibility. It's going into her credibility as to her truthfulness about what happened before [her relationship with Roe].

80. These questions were irrelevant and impermissible. Furthermore, Roe's Attorney's claims as to a prior "breakdown" and prior "rape" were not true.

81. While the Hearing Panel challenged the relevancy of Roe's Attorney's question to Witness 1, the Hearing Panel ultimately permitted Roe's Attorney to continue marshaling inaccurate, irrelevant, and inaccurate facts about Plaintiff in the private breakout room. Roe's Attorney's went on to tell the Hearing Panel:

> we know, including witnesses know, **that [her previous boyfriend] had broken up with her and she tried to kill herself** and was on medication before meeting [Respondent], that she was fragile already. And so now you have witnesses, including [Plaintiff], saying to you, 'oh, I was fine,' and then suddenly I met [John Roe] and suddenly ended up in the hospital. . .

82. Roe's Attorney's claims as to suicide, in connection with a previous boyfriend or otherwise, were false. Even if true, as the Hearing Panel initially recognized, that information was inadmissible, irrelevant as to whether it was more likely than not that Roe raped, assaulted, and sexually exploited Plaintiff, and highly prejudicial.

83. Similarly, questions as to Plaintiff's prior sexual relationships were improper and inadmissible under Juilliard's Sexual Misconduct Policy and applicable federal and State law for the precise reason that Roe's Attorney wanted to pursue them against Plaintiff: to prejudice the Hearing Panel with irrelevant, gender-biased stereotypes about victims of gender-based violence.

84. Roe's Attorney continued her aggressive pursuit to bias the Hearing Panel and damage the credibility of one of Plaintiff's main witnesses, previewing her follow-up line of questioning of Witness 1 for the Hearing Panel, stating: "'you were aware that [Plaintiff] hadn't been mentally healthy before, right, before this?', while adding, "Because if [Witness 1] says no, I hate to say it, if she says no, **she's lying about it because everyone knew**." She further argued

that she felt she had to object "if you are not being told the truth about what's going on with her mental health before [Roe]."

85.     As a result of Roe's Attorney's *ex parte* communications with the Hearing Panel, the Hearing Panel permitted Roe's Attorney to ask key witnesses improper questions that perpetuated stereotypes surrounding sexual assault victims, including with respect to Plaintiff's sexual and relationship history, her status as a victim and survivor of sexual assault, and her mental and physical health as it related to those issues, in violation of federal and State law and Juilliard's Sexual Misconduct Policy.

86.     When the Hearing resumed after the private breakout room session, Hearing Chair McLaughlin did not summarize the closed-door proceedings the Hearing Panel had with Roe's Attorney or provide Plaintiff or her advisor an opportunity to respond to Roe's Attorney's inaccurate statements and allegations.

87.     Instead, Ms. McLaughlin instructed Roe's Attorney on the Hearing Panel's decision to allow her to ask questions about observations witnesses made as to Roe's Attorney's mental health and prior relationships but not as to, as Ms. McLaughlin stated, "what a mental health issue is," as the witnesses were only students and not experts in mental health.

88.     Ms. McLaughlin suggested that Roe's Attorney "just ask the questions in the way of observations that they experienced and other relationships that they had, **if your intent is to show a pattern**, which is what I think you're trying to do, it's the idea of this use of the term 'mental health issues,' which the witness won't be able to ascertain."

89.     In other words, the Hearing Panel appeared to be helping, guiding, and inviting Roe's Attorney to establish that Plaintiff, as a previous victim of sexual assault with a perceived

mental health issue, had engaged in a "pattern" of behavior in "prior relationships or interactions with others" that made her susceptible to falsely crying rape against Roe.

90.     The Hearing Panel's conduct was an egregious violation of Plaintiff's rights and blatant act of gender and disability discrimination.

91.     Juilliard's Sexual Misconduct Policy expressly prohibits this line of questioning about the prior sexual history of the complainant during a hearing, except to prove that someone other than the accused committed the assault or the information "concerns specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and is offered to prove consent." Those exceptions did not apply here.

92.     As a result of the Hearing Panel's determination following the closed-door session with Roe's Attorney, on the first day of the Hearing, October 11, 2022, Roe's Attorney was permitted to ask Witness 1 several improper questions that violate State and federal law, and Juilliard's Policies, including:

   a.   "And you were aware that she had dated another man that was a long-distance relationship?"

   b.   "Do you recall her being incredibly upset about another individual she had dated before [John]?"

   c.   "Did she express to you that she had attempted suicide because of a prior relationship?"; when she did not like the response, she argued, *"she had never told you that?"*

   d.   "Did she express to you the relationship she had with a photographer"?

   e.   "Did you tell you that there was a photographer that had been abusive to her, prior to the last boyfriend and prior to [John]?"

93.     Witness 1, visibly perplexed and concerned by this line of questioning, which was laden with gender-based and disability animus and bias, at one point even said, "I don't know the details [of that past relationship] . . . I don't know how that is related," quipping, "but okay."

94.     The Hearing Panel deemed each one of these questions relevant, even though they violated Juilliard's policies and the law. Ms. Williams did not object to this line of questioning or otherwise advise the Hearing Panel.

95.     As a result of the Hearing Panel's determination following the closed-door session with Roe's Attorney, later that same day, Roe's Attorney was permitted to ask Witness 4 the following patently improper questions:

a.  "Did you know of a relationship with an individual she was dating long distance"?

b.  "Were you aware she had been distraught over that breakup?"

c.  "Had she made you aware that she attempted suicide over that?"; when the witness said no, she followed up with: "She had not said anything to you about that issue?"

d.  "Had she expressed to you that due to the breakup she was extremely depressed?"

e.  "Did she discuss with you the issue with the photographer prior to [John]?"

96.     As the Hearing Panel knew, questions as to the photographer were meant to elicit information about prior sexual abuse of Plaintiff.

97.     The Hearing Panel deemed each of these questions relevant and permitted each witness to answer. Juilliard's Title IX Officer, Ms. Williams, did not object to this line of questioning or otherwise advise the Hearing Panel, nor did Plaintiff's Juilliard-appointed advisor.

98.     At the start of the second day of the Hearing, Ms. McLaughlin went over a few relevant rules concerning the hearing. She warned that parties and advisors who did not abide by

these rules could be removed from the proceedings. She further reminded the participants that the role of the advisor was "solely for the purpose of delivering cross examination."

99.    The Hearing Panel then informed Roe's Attorney that questions regarding whether Plaintiff had told her friends about suicide were irrelevant but said nothing about the gender-based questions on past sexual relationships, which were also a clear violation of State and federal law.

100.    Regardless, Plaintiff had already experienced material reputational harm. Roe's Attorney had been permitted to make false and inaccurate statements about Plaintiff's mental health, specifically with respect to her dating history, in front of her witnesses – her friends and peers – and the Hearing Panel, which included a Juilliard faculty member. Furthermore, Juilliard did nothing to stop the questioning concerning Plaintiff's relationship history.

101.    Witness 1 was so upset about the proceedings that she declined to return for further questioning on the second day. Upon information and belief, Witness 1 filed a complaint against Roe's Attorney with Juilliard.

102.    On the second day of the Hearing, on October 12, 2022, Roe's Attorney asked Witness 7:

a.    "Did she tell you about a former photographer that she had been concerned about?"

b.    "Did she tell you about a relationship she had prior to [John]?"

103.    On the third day of the Hearing, on October 13, 2022, Roe's Attorney was permitted to ask Plaintiff's mother:

a.    "You were aware of the breakup before the met [John]?"

b.    "She was actually devastated regarding that breakup?"

104.    When Roe's Attorney pushed Plaintiff's mother with a question about suicide, asking her, "She became quite depressed and discussed suicide?", the Hearing Panel intervened

and did not permit the question. However, the Hearing Panel took no further action against Roe's Attorney.

105.    In that same line of questioning, Roe's Attorney asked Plaintiff's mother whether Plaintiff had been "sexually abused" before by a photographer. The Hearing Panel found this question irrelevant and did not allow Roe's Attorney to continue her line of questioning as to sexual abuse by the photographer in this instance. Hearing Chair McLaughlin consulted via Zoom chat with Juilliard's Title IX Officer, Ms. Williams, as to her ruling on the question, asking her: "Are you ok w not going down that road re photographer."

106.    Ms. Williams confirmed that Ms. McLaughlin's ruling was acceptable to her, indicating that Juilliard's Title IX Office consulted with the Hearing Panel on material decisions during the Hearing.

107.    Devastated by the experience and its portrayal of her daughter, Plaintiff's mother filed a complaint against Roe's Attorney with Juilliard's Title IX Office.

108.    Juilliard and the Hearing Panel's willingness to engage in improper *ex parte* communications with Roe's Attorney, its failures to apply the law and Juilliard's policies fairly and with the proper standard of care, and its failure to stop Roe's Attorney's misconduct and promptly remedy the harm biased the sexual misconduct proceedings against Plaintiff on the basis of her gender and perceived disability, resulting not only in a finding in favor of Roe, but long-lasting harm to Plaintiff's reputation at Juilliard among faculty, friends, and peers, and it devastated her educational opportunities, her career prospects, and mental health.

109.    The Hearing Panel's failures and the Hearing's procedural irregularities occurred because of Plaintiff's gender and because of gender-based stereotypes about victims of sexual assault, who are predominantly female, as well as her perceived disability.

110.    By written determination, on or about November 27, 2022, Plaintiff learned that the Hearing Panel did not accept any of the recommendations from Akin Gump's Final Report and instead found Roe not responsible for a single violation of the Sexual Misconduct Policy.

**F.    Juilliard Denied Plaintiff's Appeal Despite the Egregious Procedural Errors and Irregularities During the Hearing**

111.    Plaintiff filed a timely appeal in December 2022. However, it was denied on January 30, 2023.

112.    The two permissible grounds for appeal were (1) procedural irregularities and (2) bias of the decisionmakers. The Appeals Panel allegedly reviewed the recordings from the proceedings and did not view as improper any of Roe's Attorney's conduct. Similarly, the Appeals Panel did not find any evidence of bias in the Hearing Panel.

113.    Plaintiff requested that Juilliard sustain the mutual no-contact directive between the parties through Mr. Roe's graduation due to the parties' acrimonious relationship, but Juilliard's refused to do so, even though it had discretion to do so.

**G.    Plaintiff Experienced Further Harassment on Campus and Feared for Her Safety**

114.    Upon Juilliard's findings in favor of non-responsibility as to Roe, Plaintiff feared for her safety on campus.

115.    After the Hearing, Roe continued intimidating Plaintiff on campus by approaching her, glaring at her, and singing loudly at her.

116.    Plaintiff felt threatened, unsafe, and unable to remain on campus or access her dressing room during the day, thereby denying Plaintiff access to crucial social, career, and educational opportunities. She also experienced panic attacks on campus.

**H. Plaintiff Faced Retaliation from Juilliard Faculty and Staff After the Hearing Panel's Finding in Mr. Roe's Favor and Her Access to Educational Opportunities Was Denied**

117.    Plaintiff's reputation among Juilliard faculty, at least one of whom participated in the Investigation as Roe's witness, was also tarnished, and Plaintiff was unable to get the caliber of roles at Juilliard that she had gotten prior to the Hearing and was consistently overlooked for performance opportunities.

118.    For instance, Plaintiff's instructor, a Juilliard faculty member, called Plaintiff into a meeting on December 7, 2022, just days after the Determination Letter finding Roe not responsible of all counts.

119.    During the meeting, the professor indicated that she was aware that the Title IX process was now over.

120.    The professor called the meeting to let Plaintiff know that she had received only a chorus role in the musical Cabaret, not a solo or duet, purportedly because Plaintiff had not worked "hard enough" in class and others had.

121.    As the professor knew, Plaintiff spent four days in the Hearing and had to miss class as a result.

122.    Additionally, this professor was very close with Roe and had, upon information and belief, known him personally prior to his enrollment at Juilliard.

123.    During the Hearing process, this professor told Plaintiff that Respondent had informed her that legal representation in connection with Plaintiff's Title IX complaint was going to cause significant financial trouble for his family. She seemed to be aware of the Title IX process through Roe and appeared sympathetic toward him.

124.    The professor's apparent bias in favor of Roe and against Plaintiff directly impacted Plaintiff's ability to succeed in this professor's class and, more importantly, to get critical roles in the class that would help her land reputable agency representation.

125.    During the meeting informing Plaintiff that she had not received a meaningful role – only a chorus role – the professor also asked Plaintiff, "what is keeping you at Juilliard? Why don't you leave?" Plaintiff felt devastated by this comment and followed up with an email to the professor, asking her what she had meant.

126.    Upon information and belief, just before the Hearing, this faculty member and at least one other faculty member attended a meeting with the Provost to discuss the Title IX process and discussed Plaintiff's case, expressing concerns with how long it had taken.

127.    Upon information and belief, as a result of this meeting and numerous other conversations among faculty, Plaintiff's confidential Title IX process – and the outcome of the Hearing in favor of Respondent – became public knowledge among her professors and her peers.

128.    After the Hearing, Plaintiff was excluded from performances for donor galas and festivals at Juilliard. While her classmates performed, she served as an usher.

**I. Plaintiff Suffers Physical, Emotional, Reputational, and Financial Harms**

129.    As a result of Defendant's conduct, Plaintiff suffered, suffers, and will continue to suffer extensive physical and psychological injuries, including:

  a.    Insomnia;

  b.    Weight loss and digestive issues that need medical attention;

  c.    Depression;

  d.    Post-Traumatic Stress Disorder;

  e.    Panic attacks;

    f.   Ruminations; and

    g.   Feelings of despair and hopelessness.

130.    Plaintiff has suffered injury to her reputation and impaired relationships with her classmates and future colleagues.

131.    Plaintiff did not receive the caliber of agency representation upon graduation from Juilliard that she had expected upon graduation, as her peers had.

132.    Plaintiff had lead roles at Juilliard prior to the Hearing, but after the Hearing, she never again received a main part in a show.

## V.    COUNTS

### COUNT I
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—
### GENDER DISCRIMINATION IN EDUCATION
### New York City Administrative Code § 8-107 *et seq.*

133.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

134.    N.Y.C. Admin Code § 8-107(4) prohibits places of public accommodation from discriminating because of gender and from "refus[ing], withhold[ing] from or deny[ing] the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation."

135.    Juilliard is a place of public accommodation under § 8-107(4).

136.    In exercising her rights under Juilliard's policies to adjudicate her complaint of sexual assault, dating violence, and sexual exploitation against Roe, Juilliard treated Plaintiff less well than other students for a discriminatory reason, her gender, during the investigation, throughout the four-day Hearing, during the appeals, in connection with her over 15 reports of Roe's potential NCO violations, and thereafter, including by sanctioning, permitting, perpetuating,

and failing to stop and/or remedy rape and gender-based myths used against her by Roe's Attorney during the Hearing.

137.    Plaintiff's female gender was the motivating factor for the discriminatory treatment she faced.

138.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

139.    Given the continuous nature of Defendant's discriminatory, gender-biased manner that Defendant treated Plaintiff, the continuing violation doctrine applies to the unlawful acts alleged in connection with this claim.

140.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT II
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW— DISABILITY DISCRIMINATION IN EDUCATION New York City Administrative Code § 8-107 *et seq.*

141.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

142.    Plaintiff had a perceived disability of mental illness during the Hearing and thereafter.

143.    N.Y.C. Admin Code § 8-107(4) prohibits places of public accommodation from discriminating on the basis of disability, which includes perceived mental or psychological impairment.

144.    Juilliard treated Plaintiff less well for a discriminatory reason, her perceived disability, during the hearing and appeals process and thereafter, including by sanctioning, permitting, perpetuating, and/or failing to stop or remedy disability-based stereotypes used against her by Roe's Attorney during the Hearing.

145.    Plaintiff's perceived disability was the motivating factor for the discriminatory treatment she faced.

146.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

147.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT III
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW— RETALIATON
### New York City Administrative Code § 8-107 *et seq.*

148.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

149.    Plaintiff engaged in protected activity when, among other things, she reported to the Title IX Office sexual assault, dating violence, and sexual exploitation against Roe.

150.    Defendant was aware of the protected activity in which Plaintiff engaged because, *inter alia,* Plaintiff made a formal written complaint to the Title IX Office and because senior administrators at Juilliard, including the Provost, knew or should have known, that Plaintiff had made such a report.

151.    As a result, Defendant engaged in conduct that was retaliatory by subjecting Plaintiff to a biased and discriminatory hearing and appeals process, further harassment by Roe, and by refusing to implement protective measures to allow Plaintiff equal access to her education.

152.    Retaliatory animus was the motivating factor in Defendant's actions.

153.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to lost future employment, reputational harm, humiliation, embarrassment, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

154.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

155.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT IV
### VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW – GENDER DISCRIMINATION IN EDUCATION
### N.Y. Exec. Law § 296

156.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

157.    New York Exec. Law § 296(4) provides that: "It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his gender identity or expression . . . sex . . . [or] status as a victim of domestic violence."

158.    New York Exec. Law § 296(4) applies to "educational institutions," which includes private colleges and universities, such as Juilliard.

159.    As amended in 2019, the NYSHRL must "be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300.

160.    Defendant has subjected Plaintiff to harassment and differential treatment and inferior terms, conditions, or privileges of her education in violation of the New York State Human Rights Law on the basis of her gender and her status as a victim of domestic violence, during the investigation, throughout the four-day Hearing, during the appeals, in connection with her over 15 reports of Roe's potential NCO violations, and thereafter, including by sanctioning, permitting, perpetuating, and failing to stop and/or remedy rape and gender-based myths used against her by Roe's Attorney during the Hearing.

161.    Defendant was also deliberately indifferent to the hostile education environment that Plaintiff endured.

162.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

163.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm.

164.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law, including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT V
## VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW –
## DISABILITY DISCRIMINATION IN EDUCATION
## N.Y. Exec. Law § 296

165.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

166.    New York Exec. Law § 296(4) provides that: "It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his . . . disability."

167.    The term "disability" includes "a condition regarded by others as such an impairment."

168.    Defendant has subjected Plaintiff to harassment and differential treatment and inferior terms, conditions, or privileges of her education in violation of the New York State Human Rights Law on the basis of her disability, during the investigation, throughout the four-day Hearing, during the appeals, in connection with her over 15 reports of Roe's potential NCO violations, and thereafter, including by sanctioning, permitting, perpetuating, and failing to stop and/or remedy disability myths and bias used against her by Roe's Attorney during the Hearing.

169.    Defendant was also deliberately indifferent to the hostile education environment that Plaintiff endured.

170.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

171.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law,

including compensatory and emotional distress damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT VI
## VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW – RETALIATION
### N.Y. Exec. Law § 296

172.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

173.    Defendant unlawfully retaliated against Plaintiff in violation of N.Y. Exec. Law § 296(7), which states: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

174.    Plaintiff engaged in protected activity when, among other things, she made a report of sexual misconduct and dating violence to the Title IX Office and participated in the disciplinary proceedings, including the hearing and appeals process.

175.    Defendant and high-level administrators, including the Title IX Office, were aware of the protected activity.

176.    Defendant engaged in conduct that was retaliatory by subjecting Plaintiff to a biased and discriminatory hearing and appeals process, further harassment by Roe, and by refusing to implement protective measures to allow Plaintiff equal access to her education.

177.    Defendant acted willfully, with negligence or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

178.    As a result of Defendant's unlawful discrimination, Plaintiff was deprived of her equal access to her education, her ability to access and succeed in her classes, her ability to

participate in plays, one-act shows, or other drama and theater projects, the successful start to her career, and suffered severe emotional distress and physical damages.

<u>**COUNT VII**</u>
**NEGLIGENCE, NEGLIGENCE PER SE, and NEGLIGENT SUPERVISION**

179.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

180.    At all relevant times, Article 129-B of the N.Y. C.L.S. Educ. Law and the implementing regulations of Title IX of the Education Amendments of 1972, 34 C.F.R. Part 106, governed Defendant's procedural and guidelines in adjudicating reports of sexual assault and misconduct.

181.    Plaintiff, as an individual who reported sexual assault and misconduct, was a person for whose benefit Article 129-B of the N.Y. C.L.S. Educ. Law and the implementing regulations of Title IX of the Education Amendments of 1972, 34 C.F.R. Part 106 were enacted, and a private right of action would promote the legislative purpose of ensuring fair hearings following reports of sexual assault and misconduct.

182.    Defendant owed Plaintiff a duty of care, which was articulated in Article 129-B of the N.Y. C.L.S. Educ. Law and the implementing regulations of Title IX of the Education Amendments of 1972, 34 C.F.R. Part 106, as well as its own policies.

183.    Defendant had a duty to hire competent personnel to oversee its Title IX Office and the student grievance processes as articulated in the Sexual Misconduct Policy, as well as to train, supervise, oversee, manage, or sanction or terminate such personnel for poor performance, including failure to follow Juilliard policies and the law.

184.    Defendant had a duty to Plaintiff to ensure a fair and impartial investigative, hearing, and appeals process.

185.    Defendant breached these duties of care and was negligent in its hiring, training, supervision, and disciplining the Hearing Panel and the Title IX Office personnel, including in the following ways:

a.  Failing to ensure that the Title IX Office and the Hearing Panel were adequately trained as to their obligations and Plaintiff's rights as articulated in Article 129-B of the N.Y. C.L.S. Educ. Law, the implementing regulations of Title IX of the Education Amendments of 1972, 34 C.F.R. Part 106, and its own policies, including the Sexual Misconduct Policy;

b.  Failing to advise Plaintiff accurately as to her rights and the remedies available to her under Juilliard's policies and the applicable laws;

c.  Failing to provide sufficient guidance and permitting the Hearing Panel to engage in numerous prejudicial and improper *ex parte* communications with Roe's Attorney during the Hearing, concerning material matters, and failing to remedy the harm and bias caused by Roe's Attorney's communications;

d.  Failing to provide sufficient guidance, training, and supervision to the appellate panel with respect to impartiality and fairness in Sexual Misconduct proceedings;

e.  Failing to ensure that students, staff, administrators, employees, agents, and representative are not engaging in retaliation forbidden by applicable State and federal law and school policies and procedures;

f.  Failing to ensure Plaintiff remained free from retaliation from Roe and his friends;

g.  Failing to ensure Plaintiff's safety on campus and her ability to access her classes and academics during the investigative, hearing and appeals process and thereafter;

h.   Subjecting Plaintiff to continue her studies on campus with Roe, without any NCO in place; and

i.   Failing to train faculty and staff on school policies.

186.   At all relevant times, Defendant knew or, in the absence of negligence, should have known that its agents, staff, and employees were inadequately trained, lacked the requisite skill or knowledge, and were not prepared or suited to conduct, oversee, supervise, or manage the Hearing in this matter.

187.   As a direct and proximate result of Defendant's negligence, Plaintiff suffered damages.

**COUNT VIII**
**NEGLIGENT INFLICATION OF EMOTIONAL DISTRESS**

188.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

189.   At all relevant times, Defendant owed Plaintiff a duty of care, which was articulated in Article 129-B of the N.Y. C.L.S. Educ. Law and the implementing regulations of Title IX of the Education Amendments of 1972, 34 C.F.R. Part 106.

190.   Despite Defendant's obligations under federal and State law and Juilliard's policies, Defendant failed to conduct a fair hearing and appeals process and to meaningfully respond to breaches of the NCO and to extend the NCO after the appeals process, causing Plaintiff to fear for her own physical safety and to experience ongoing harassment and intimidation on campus.

191.   Given Plaintiff's allegations of gender-based violence, including rape, strangulation, assault, and sexual exploitation against Roe, there was a heightened likelihood that

Plaintiff would experience genuine and serious mental distress as a result of Defendant's breach of its duty.

192.    As a direct and proximate result of Defendant's breach of its duty of care, Plaintiff did in fact suffer genuine emotional harm, which included fear for her physical safety while on campus while having to complete her studies at Juilliard alongside Roe.

193.    As a direct and proximate result of Defendant's negligence, Plaintiff suffered damages.

### COUNT VI
### BREACH OF CONTRACT

194.    When Plaintiff accepted admission to Juilliard, an implicit contract was formed, as Plaintiff complied with the university's policies, trainings, bulletins, and regulations that were made available to her.

195.    Implicit in the contract was the requirement that Juilliard act in good faith in its dealings with Plaintiff and other students.

196.    Plaintiff fulfilled her end of the bargain by paying the required tuition, charges and fees, satisfying the academic requirements, and complying with Juilliard's policies, including as they related to the Title IX proceeding against Roe.

197.    Juilliard breached its implied duty of good faith by failing to conduct a fair and impartial hearing and appeals process and taking retaliatory action against Plaintiff for bringing a Title IX complaint against another student and seeing it through.

198.    As a result of Juilliard's actions, Plaintiff has suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.      Award Plaintiff all of her damages under the NYCHRL and NYSHR, including compensatory damages and punitive damages in an amount to be determined at trial;

B.      Award Plaintiff all damages for mental pain and anguish and severe emotional distress, according to proof;

C.      Award Plaintiff all attorneys' fees, costs, and expenses available under law;

D.      Award Plaintiff all pre-judgment interest and post-judgment interest available under law; and

E.      Award Plaintiff such additional and further relief as this Court may deem just and proper.

**VI.    <u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues triable of right by jury.

Respectfully submitted,

Dated: New York, New York
      October 10, 2025          **THE FIERBERG NATIONAL LAW GROUP, PLLC**

By:_____
Olympias Iliana Konidaris
305 Broadway, Seventh Floor
New York, New York 10007
Phone: (347) 504-0220
Fax: (231) 252-8100
ikonidaris@tfnlgroup.com